We have an oral on the people of State of Illinois v. Dominick Steppan. We have Mr. Larry Wells for the appellant. And we have Mr. Stephen Norris and Kelly Stacey for the appellee. And you have divided your time. So you may proceed, Mr. Wells. May I please report? My name is Larry Wells. I represent the defendant, Mr. Steppan, in this court. Mr. Steppan was convicted of attempted first-degree murder and aggravated discharge of a firearm. He raised several issues before this court. But unless there are questions, I'm going to confine my presentation today to Issues 2, 3, and 4 of the brief. That's reasonable doubt, prosecutorial misconduct, and the per se veritable error of failing to have Mr. Steppan examined by a psychiatrist. Mr. Steppan would stand on his brief and his motions concerning any point that's not raised here today. The reasonable doubt issue is a very simple one. The State alleged that Mr. Steppan was guilty of attempted murder for firing a weapon into the complainant's house and trying to kill him. Thereby, the State had to prove that there was a specific intent to kill in order for the defendant to be found guilty of attempted murder. And the facts of the case are that the shooter was standing about an arm's length away from the main window in the living room downstairs and was pointing the gun up and fired through the window in the room upstairs and into the ceiling. And there were several shots that were fired. I couldn't follow the facts about – it went through a pillow and a headboard and a pillow? Yes, the – How could it do – Well, the – what happened was that there was a window there and the headboard of the – Was up against the window? That's right. The headboard was bigger than the section of the wall. And if you had your head on the pillow? I beg your pardon? What would happen if you had your head on the pillow? Well, there's – I don't think there's any specific evidence about whether there was any – the angle was such that someone – I'm talking about the pillow. I'm just talking about this – the facts I was looking at. Sure, yeah. I mean, yeah, if someone had been right up against that pillow, the bullet would have gone through them, absolutely. Yeah, that's – But you couldn't see through the headboard, or could you? No, this is – Was it bars or – No, that's – certainly the facts of the case are that there's no evidence that the person who was doing the shooting could see anyone in the rooms upstairs and no evidence that anyone in the rooms upstairs could see the person who was doing the shooting. There's no evidence the person who was doing the shooting was aiming at anyone. What time was the shooting? I don't remember the exact time. It was after dark, though. I think it was 9 o'clock. I can't remember. It certainly is established in the record, though. Now, the people downstairs – there were people downstairs in the living room. There was a lot of people downstairs. There were people watching television. The television was on, and they heard the shots fired and saw the muzzle flash from the weapon being fired. And they could see the person who was aiming the gun upward into the upper story of the house. Had Mr. Stephan been in the house before? Oh, yes. I think he'd been in the house several times. So he might know what rooms were what? Oh, sure. I think that's possible. And I don't think there's any evidence that he had specifically been in any bedrooms upstairs, but certainly it's entirely possible that he knew – it's entirely possible that he knew that that was the bedroom that the complainant stayed in. Certainly. One of the cases that we rely on is the Kester case from 1990 in Missouri. It was the closest case I could find in the past. In that case, there was evidence that the defendant had threatened the life of the homeowner and said, I'm going to kill you. And then shortly afterwards, a day or two afterwards, fired blindly into a window of the house. No evidence that he could see that – there was evidence that someone was in the house,  and certainly no evidence that the shooter could tell that someone was in that room or was aiming at him. And yet that person, the shooter, was convicted in the Missouri case of attempted murder. And the Missouri Supreme Court said, no, that does not establish a specific intent to kill. They said that, at worst, the act was characterized by a spirit of ruffianism and indifference to result, which richly merits punishment under a proper proceeding, close quote. And they made reference to a statute that was in force in Missouri at the time that made it a very serious felony to discharge a firearm into a dwelling place. And, of course, we have that statute here too. Aggravated discharge of a firearm. But it's not intent to kill. You have to have an action which shows that you're aiming directly at someone and trying to kill them, and simply discharging a firearm into a house is not sufficient to establish that. We also rely upon Illinois cases that talk about the difference between the knowing mental state is sufficient to convict for first pre-murder and the specific intent to kill, where a defense fired into a building and has killed someone, and he says, you can't establish that I have this specific intent to kill because you can't prove that I was pointing the gun at a particular person. And Illinois courts uniformly say that's correct. You cannot establish a specific intent to kill with that. But that's not what's required for a murder conviction. As long as there was a knowing mental state that it was a practical certainty that you would hit someone when you fired. That's a knowing mental state, and it can support conviction for first pre-murder. And those first pre-murder convictions were upheld on that basis. Not because there was a specific intent to kill. The court said there was no evidence of a specific intent to kill. And so based on the Kester case, which is persuasive authority, it's not directly authoritative because it's from a system state. But the state has not argued that the Kester state was wrong. The Kester decision was wrongly decided. Surely there's a bunch of drive-by cases then that would state this or not. Have you seen any drive-by shooting cases? Because they're not really aiming, I wouldn't think. Well, there's transferred intent situations. There's transferred intent situations where a gang member would be shooting at someone and then kill someone else. But that would be a different situation altogether. If you can prove that someone's aiming directly at someone, then that would be a separate matter. I mean, I think it's common knowledge that if you're going to shoot up in the air, that's a warning shot or a threatening shot. Or in this case, perhaps there's an intention to do criminal damage to the property. It certainly did do criminal damage. But as I recall in the briefs, there was a bullet lodged in a vehicle. Yes, there was one shot. And then there were nine bullets shot into the bedroom. I don't think all of them were in the bedroom. I think a couple of them ended up in the bathroom. But they were shot into the bedroom windows and entered the bathroom. You might be right about that. But I believe that, let's say, six of the shots went directly through the window. And then I think a couple of them might have gone through the wall. But my point is that I can see a distinct difference between shooting straight up in the air where there's very little chance you will shoot a person. And you might be trying to threaten an activity and shooting into a window at night where someone might be sleeping. Oh, might be sleeping is, of course, the important part. That could be as they stay here. And that's an act of recklessness, ignoring the recklessness of disregarding the chance that someone would be there. But that's not specific intent to kill. You have to establish that someone's pointing at someone and trying to put someone in the line of fire. And if someone was trying to hit somebody in that room, you would stand off and shoot long ways across the room. Not up and through a window, but across the room where you'd be likely to strike someone, not straight up. Well, straight up and through a window is not the same thing. Oh, I didn't mean at 90 degrees, but very steeply upwards. And that is the distinction that we're trying to make here is that the shooting into a ceiling. And a headboard and a pillow. Well, it's true that a headboard and a pillow was hit, but there's no… No, it went through, it also went through the window. The window wasn't on the ceiling either. That steep angle is indicative of something else besides a specific intent to kill. And certainly without any evidence of aiming at anyone or knowing that someone was in the line of fire would establish there was no intent to kill. Instead, there is this intent to cause criminal damage to property or this intent for ruffianism or to threaten someone or intimidate someone. As far as I could find, there's no case saying shooting blindly in the house, not knowing if someone's there or not, in the line of fire. Now, was this a situation where you'd have to have lights on if somebody was there, wear lights on? Was it dark? I believe that there was a lamp on by the bedstead in that room at the time. But there's no evidence that anyone could be seen from outside. So we've asked this Court to rely on the Tester case and the Illinois cases that distinguish between the knowing mental state and the specific intent to kill and the aversive condition for lack of evidence. I'd like to turn now to the per se reversible error of the defense attorney failing to have the defendant examined by a psychiatrist before trial. We rely on four cases in our brief, the Howard case, the Baldwin case, the Young case, and the Hayes case. In each of those cases, the records show the defendant had schizophrenia and he was not examined before trial for insanity. And the courts in those cases said because you could tell that the defendant had been hospitalized for schizophrenia, it was ineffective assistance of counsel for the attorney to fail to have the defendant examined. And in this case, there's evidence that Mr. Stephan had been hospitalized for schizophrenia. He'd been found unfit to stand trial in 1998, and that he tried to kill himself before. Mr. Welch, procedurally, tell me how you think this should have gone, because I couldn't tell whether or not you were just alleging that the attorney was incompetent because she didn't present the evidence, or whether or not she was incompetent for not even knowing whether or not he had prior sight. I'm sorry if that wasn't any more clear. In the cases, all the cases were reversed and remanded for a new trial because there was no examination of the defendant before trial. And that's what we're asking for. But how should it have come to her attention? Did she have records in her possession that she would have known that he had had prior psychiatric, or was it her failing to discern that? Yes. The cases say that the defense attorney is responsible for doing a reasonable amount of investigation in order to establish this, whether the defendant has a psychiatric history. We know from the present investigation report that there were records available, easily available, and that's what the standard is. There's easily available records that are easily found, and it's per se reversible error for the attorney to fail to do the necessary investigation, find this out, and have the defendant examined. And the state has not disagreed with these cases. These cases stand for a very simple proposition that because schizophrenia is a recognized basis for absolving a defendant of criminal liability, the defendant with schizophrenia has to be examined to see whether that defense would apply. Did he have schizophrenia? I thought they said that he had schizo personality or something, which is different. I believe that they showed that he had schizophrenia. He was certainly hospitalized for psychosis. Yeah, I think there were some pretty serious issues that he had mentally, but I thought it was schizoid personality. I showed at the present investigation report at page 11 and 12 that he had schizophrenia and he had psychosis. And in any event, psychosis is sufficient in and of itself. Now, the state hasn't taken any issue with the holdings in those cases, the four cases that we cited. So what would be the remedy at this point? Remand for a new trial where he would have a proper investigation for the trial. The state's position is that this was a strategic decision on the part of defense counsel, and that this court should not second-guess the trial strategy of defense counsel. And we do not agree with that as a general principle at all. But that would presume that she knew that he had a psychiatric problem. That's exactly correct. Their ignorance is not a trial strategy. Failing to prepare for trial is not a trial strategy. Failing to prepare for trial is ineffective assistance of counsel. And the case is saying that courts closely scrutinize the pretrial preparations of an attorney. They give great deference to the strategic decisions that an attorney makes once those investigations are done. But here, there was no investigation, there was no examination of the defendant, and consequently, it's per se reversible error for this case to go to trial, someone who has psychosis, been hospitalized with psychosis, and then not have a mental exam for a trial. We'd ask this court to follow those cases and remand this case for a new trial where he would be properly examined for it. Next issue is prosecutor misconduct. That's issue two. No, issue three in the brief. There's only three facts that we rely upon for establishment of this claim. First, the complaining witness testified in front of the jury that he had not had a criminal conviction in 15 years. That would have been 1990. The second fact, the prosecutor told the judge that the witness' testimony was false, that it was 1996 when he had his most recent conviction. And third, no one told the jury that the witness had made a false statement. Now, we cite cases that stand for the proposition that the prosecutor has the duty himself to correct the false statements of his witness. He can't rely on the judge to do it. He can't rely on the defense attorney to do it. He's got to do it himself. And this prosecutor did not do that. That's a due process violation. And this is an important witness, the complaining witness, after all, and the complaining witness who testified that the defendant had a pistol. These folks have said the weekend before, according to the complaining witness, that the defendant was bragging about having access to a pistol and not just any pistol, to a .40 caliber pistol. And, of course, .40 caliber pistol brass was found scattered around the area where the shots were fired. And the jury needed to observe this witness and draw conclusions about this witness' credibility. And they couldn't do that without seeing this witness confronted with the fact that he'd taken the stand and testified falsely about his prior record of convictions. If they had seen how this witness reacted when he was confronted with that, they would have been able to assess his credibility as required under the Constitution. The jury could have seen how he reacted. They could have noticed that he was exaggerating his criminal history of conviction, exaggerating the time between when it occurred and now, making his case look better, making the defendant's case look worse. And they could have concluded from that reaction that he was exaggerating the testimonies he was giving about the statement the defendant made his way. The defendant made some perhaps innocuous statement about a pistol. And he had exaggerated that to include that it was a .40 caliber pistol. These decisions about credibility have to be made by the jury who is aware, the jurors who are aware of the true extent of the impeachment of the witnesses. And this was blocked due to a due process violation because the prosecutor did not correct the false statement of the witness. That's a due process violation. And I would like to turn to the motion that was taken with the case. In the previous versions of Issue 3 that was presented, there was material presented from Nevada about the previous convictions of Hamrick, the complaining witness. And in this Court's order, it stated that the contents of those Nevada convictions were not to be brought up in the briefs. And we complied with that. I've already told you the three facts that we relied upon for reversal in that issue. They don't have anything to do with the content of the Nevada attribute. But the State said in its brief on page 35, quote, it is unclear and by no means established whether the certified copy of Hamrick's conviction would contradict his testimony that he had not been convicted of any crime 15 years before trial. Now, that's a false statement. Everybody knows that's a false statement. Those certified copies of convictions are in the motion practice in this Court. And besides that, it's also a violation of this Court's order. This Court said don't talk about the content of the Nevada material. We didn't talk about the content of the Nevada material. They brought it up right there in that statement. They're not supposed to be bringing it up. And if they are going to talk about it, they certainly shouldn't say something false. We know that Hamrick was convicted as a state in 1999. We know he would be contradicted by those records if they were brought forward. So it's wrong for the State to say otherwise. Just because the record is blank doesn't mean you can fill it with something that you know is false, and that's what the State has done here. And we've asked this Court to strike that statement that's made in the brief, or if the Court's going to reconsider, then we should have the Nevada material considered. The Nevada material is not going to be considered. We'd like to have it not considered by anybody, not just brought up by the State. So we've asked the Court to strike that offending statement from the State's brief. How much time do I have left? A minute? A minute and 25? Since I have such short time left, I will stand on the brief and motions concerning any other points. It's not right here today. Thank you. You'll have the opportunity for rebuttal. Mr. Norris? It pleases the Court, counsel. This is slightly backwards from the way I planned it, because I want to respond immediately to something that was just said by opposing counsel, and that is the statement that somehow my colleague, Kelly Stacey, has violated this Court's order about bringing in the Hamburg records because she made a statement about what the record on appeal can be said to show or not show. I don't think that counts as bringing in the Hamburg records to support anything. In fact, the point is that the record on appeal as it stands does not show what impact those records would have in a trial as the trial was progressing, with the parties on both sides able to put on a lot of evidence and so on. So that is just a gross misstatement. Now, that is characteristic of what's been going on in this case. One thing I did say, and my objection to his motion to strike Ms. Stacey's brief, is that there has been a good deal of wasted time in this case. And I just want to let the Court know just how much. In this case alone, our office has spent 94.5 hours on motion practice, most of which is unnecessary. This case began with a motion to file a brief in Stantor by a defendant and a motion to supplement the record with the Nevada records, which were never introduced at the trial court. The trial judge never saw them. There was nobody at the trial court who saw those records. They were off-site in Nevada, out in the desert somewhere, as far as I can remember. This Court ordered, and the defense counsel was so sure he was going to get those records in or that he could persuade the Court to put them in, he appended them to the brief that he was filing in Stantor. So he goes forward with appending the records to the brief, and at the same time that he's asking this Court to grant a motion to supplement the record with the Nevada matters. That motion to supplement was denied. The motion to file a brief in Stantor was denied. And I say that order was in the same order. That order is the key order in the case, denying an attempt to put those records into the case. And since that time, this Court has had to enforce that order at least three or four times, because when the defendant was directed, after that order was issued, to file a brief which did not make reference to those records, and put it in the appendix of that original brief, he did it again. He filed a brief which had a footnote which was occasionally introduced by first saying that the trial prosecutor had corrected Hampert's testimony, and then saying, well, wait, we don't want to mislead the Court. My client does not want to mislead the Court into thinking that that correction was correct. And then comes this paragraph-long footnote which brings the Hambert-Nevada records back into the case. And that's been going on throughout this case until finally this Court struck Issue 3 entirely, which the Supreme Court reinstated, but that is not a presidential order. It was a motion for supervisory order. Coming up to the motion, to where we stand on motions, one thing that is characteristic of both the motion to strike Ms. Stacy's, part of Ms. Stacy's brief, and the motion to strike my objection are some rather interesting statements. And one of them is, in the first case, a statement to the effect that Ms. Stacy did not acknowledge, and never did not acknowledge, not only did she not acknowledge it, but she never claimed that the Nevada records were not true. And, in fact, if you look at that motion to strike Ms. Kelly's, part of Ms. Kelly's brief carefully, and I believe it's in paragraphs 1 and 2 of that motion, what you will see is plain reliance on the truth of the Nevada records to argue that she lied in the brief. When she made the statement to the effect that the record on appeal, as it stands, does not show what impact those Nevada records would have if they were introduced. They were not introduced. So we've come from using the Nevada records initially, attempting to use them as a stepping stone and a basis for arguing that the trial prosecutor committed misconduct, and as this court has had to strike those attempts on more than one occasion, we now come to a audacious motion to strike part of one of the state's briefs, because it declines to rely on the same stuff that this court ruled out of the case. Now, I don't know what to call that, and I'm afraid to even venture to call it anything, or the pros police will come down on me. But that's where this thing stands at the point at which we face these motions, and I have to confess I made perhaps a mistake. I shouldn't have objected to the motion to strike. I should have moved to strike, and what prevented me from doing so was sensitivity to what non-lawyers think of these mirror image motions to strike. They're going to motion to strike, the motion to strike, the motion to strike, and I did not want to start that game, so I just filed a complaint called objection, which has now been criticized as vituperative, and I don't know what else. But I have looked, I have found cases, and I've cited them in my objection to his motion to strike, my objection. I have found cases which use precisely the kind of language that I've used, and I have not found a single case that kicks out any language that I've used as improper. Ordinary descriptive terms. A diatribe is an ordinary descriptive term. You look it up in the dictionary, it's a fairly lengthy attack on something. And very often, I think in its history, I think it was an enthusiastic attack on the statement. The statement that a literate 12-year-old would understand that the lead paragraph in Kelly Stacey's brief, which indicated that she was talking about the record on appeal, that that subject matter designation continued on into the rest of the statement, and that she was still talking about the record of appeal. She was not talking about life in general. She was not standing outside the record and declaring from her personal knowledge that something in the handbook records were false. She was not making any claim based on her personal knowledge that something was false. So, I'm going to leave this as it stands. I will stand on the responses that I've made to the motions to strike. And I urge this Court to give careful consideration to what's gone on in this case. And the amount of time that it's cost. And it's not the first time that this particular attorney has put the State in that position. Thank you for your argument. Ms. Stacey? Thank you. Your Honors, Counsel, may it please the Court. My name is Kelly Stacey, appearing on behalf of the people. All the defendant wanted in this case was a fair trial, but he was blocked and frustrated at every turn. He was not tried within 120 days. The State did not give him all the discovery at once, but instead as they received it. And he was somehow blocked from being able to present a certified copy of Kevin Hambrick's convictions from Nevada. He says the State should have gotten these documents for him, even though he never asked for any help getting them. He accuses the State of misconduct at trial and me of making an argument in bad faith before this Court. It seems like nobody wanted to give him a fair trial. Not the judge, not the jury, not the State, and not even his own attorney. Although the defendant's attorney went on record saying she did not impugn the State for any issues with discovery, now on appeal, he says his attorney was wrong and he accuses his attorney and family to investigate his mental health before she let him go to trial. Do you think she has a duty to determine whether or not he appears to be in need of a fitness hearing or question his mental health and determine whether or not he has a history of mental illness that might subject him to a fitness hearing? In Illinois, the person is presumed fit to stand trial. I know that. Looking at, when did the issue first come up? What my question is, as her, as his advocate, does she have a duty to determine whether or not she thinks he may not be fit to stand trial? I think she has a duty. If something presents itself that makes her question his fitness or ability to stand trial, she has a duty to raise that issue with the trial court and ask for a fitness hearing. I don't believe anything was raised that led her to that conclusion except for after his girlfriend testified and the testimony went really badly, the defendant calls out in open court, oh, I'm on psychotropic medications and I haven't taken all of them and I haven't had a fitness hearing. Well, the State pointed out, when asked by the court, what do you think of what the defendant is claiming? The State pointed out, well, he didn't raise any issues until now. Everything was going fine for the State. Now that it looks like it's going badly for him, he says he wasn't given all of his medication. It's not that he wasn't given all of his medication. He declined to take the GeoBilm that he was prescribed. The question is, though, relates to his attorney's duty to ascertain whether or not, I mean, maybe he's refusing to take his medications because he's just that crazy. So, I mean, does she have a duty to be aware of what looks like a fairly serious psychiatric history? There's no question that this defendant has had a psychiatric history. That's fairly serious. It looks like it's fairly serious. And it looks like it's chronic. Where this came up was in the PSI. The pre-sentence investigation was ordered after the trial. And that goes back to my original question. She's learning about it at the PSI. It's a little too late. So does she have any duty at all to ascertain whether or not her client has what looks like to be a very serious psychiatric history? It might affect his fitness to stand trial. I'm sorry. I don't believe she has an independent duty to go to the court and ask for an expert to ascertain the defendant's ability to stand trial. No, what about his records? I guess that's what I'm trying to get to. I mean, if he had, you know, you're saying that it sounds like it was somewhat contrived that, you know, he brought it up when things looked like they were going south or something. Right. But, I mean, if he, I don't think we can presume that these psychiatrists were all duped. I mean, it looks like he had a serious chronic psychiatric history and condition. It doesn't look like that. It looks like he had in the past, at least at times, had periods of time when he was clearly not fit to stand trial. It also appears from those records through the PSI that each time he had a trial, the court determined he was fit to stand trial. As far as whether an attorney, the only way an attorney knows that there's a problem with the client is if it presents itself, either during interviews or somehow during the trial. Is there something that rears his head that should have led her to believe she should have had somebody check him out for fitness? It doesn't look like any of that occurred. It doesn't look like anything happened prior to the time when he said, hey, I didn't take all of my medication. At that point, the judge stepped in and said, well, let me ask you this. Were you offered your medication? I guess my point is a distinction from what you're talking about, a psychiatric assessment. I'm talking about the fact that it looks like she has no clue that he has a psychiatric history. And as his advocate, do you think that she should know this? I mean, the fact that he's on psychiatric meds means something. It may or may not mean, and there's a presumption that it doesn't mean he's unfit. But shouldn't she know that or discover to what extent he has mental illness? If the defendant had brought those records in or raised it with her in an interview, then I think she has a duty to at least look into that matter. It doesn't look like any of that occurred. In fact, when it was raised about him not taking the medication and when the PSI came in, it looks like they talked about it at that point. Defendant's counsel apparently disagreed with his assessment, his own assessment, that he should have a fitness exam before sentencing hearing. And she said, if you insist on going forward with this request, I'm moving for leave to withdraw. So we don't know exactly what happened. We were asked to kind of read in between the lines of the record on appeal here. But clearly, if something had raised its head that made her, should have made her aware that he had a previous psychiatric issue, then yes, she should have looked into that. There's no indication that that happened. There's no indication that she ever even knew that he had these prior psychiatric examinations or prior psychiatric hospitalizations. But I would agree that if something came up during the course of interviews or during the course of the trial, she would have a duty to ask for a fitness examination. So it's your position that even though it did come up during trial, she made an evaluation herself that it was staged or something along those lines and did not believe that it was genuine? That's certainly what it looks like. There's not anything specifically on the record that says that, but we can read in the record where she says, if you insist on going forward this way, I'm moving for leave to withdraw. She could not in good conscience continue to represent him in the case. Then he said, well, go ahead and withdraw your motion and represent me at the sentencing hearing. So he made the decision here. And there's no indication anywhere in the record that he was ever unaware of what was going on. From the very first day he went into trial, went into the court proceedings, he said, I want my 120-day speedy trial rights here. There's no indication he didn't know what was going on. The defendant claims the state's attorney committed prosecutorial misconduct in this case for failing to provide the jury with the information he decided to go to trial without, and that's those Nevada records. The defendant has the burden of showing the state knowingly used false or perjured testimony. He cannot, here, meet that burden. The state's attorney never even had those records. What the state's attorney had was the NCIC and Leeds printouts that are in the nationwide clearinghouses. Those documents are discoverable, but they are not competent evidence. And were they turned over? Is that how he became aware of the Nevada records? That's correct, Your Honor. And then you're saying that the defendant then is the one who actually was attempting to have them disclose to him. That's correct. The defense counsel let the court know, I need a continuance in this case because there were these witness convictions out here that I'm trying to get. And you never got them at all? The state never got the records, and neither did the defense. It appears as though appellate counsel was able to procure those records, but no one had those records. And that's the problem with an NCIC and Leeds document. We don't know if what's in those documents is accurate or not. We don't know whether or not that 1999 escape charge was even mentioned within those documents. I think the inference is it probably was left out of there. How that happened, I don't know. But those documents are certainly not competent evidence of what's contained within those documents. The most we can point to here is an inconsistency in the testimony of Kevin Hammer. An inconsistency in the testimony does not establish perjury as a matter of law. The defendant also has to show a reasonable likelihood that the allegedly false testimony could have affected the jury's verdict and that the testimony was material to his guilt or innocence. The question of guilt is for the jury. The jury heard overwhelming evidence of the defendant's guilt in this case. He argues the evidence is consistent with an act of intimidation, shooting into a house to frighten, distress, or alarm the owners and occupants. The jury certainly saw it differently. The jury found the evidence was sufficient to support a guilty verdict for attempted murder. And the evidence here does not merely establish that the defendant tried to intimidate Kevin Hammer, but that he took a substantial step toward the commission of murder and he had the specific intent to kill. Intent in this sort of a case is proved from circumstances and inferences reasonably drawn from the evidence. You rarely have direct evidence of intent. It's almost always done by circumstantial evidence. The evidence here showed that the defendant made the specific threat to kill Kevin Hammer. The same day the defendant made threats against Hammer, the defendant and his girlfriend drove from Vienna to Metropolis, and they went to the Sonic restaurant, which was just a couple of houses away from Kevin Hammer. The defendant's cell phone confirmed that he made phone calls to the Super Museum, where two employees said that he had called and made threats against Kevin Hammer earlier that day. The defendant told Connie Hammer, Kevin's wife, that he had nothing against her or the children, but that he was going to kill Kevin. Within hours, the defendant was following through on his threat. Nine spent shell casings were admitted into evidence. A tenth projectile hold was found in Hammer's Dodge Caravan and was parked in the driveway. All nine casings came from a .40 caliber firearm. The defendant kept a .40 caliber firearm in his girlfriend's purse, presumably for just such an event. Your Honor, we respectfully request the court to deny the motion to strike and determine the jury's verdict. Thank you. Mr. Wells, rebuttal. Turning to the failure to attack the defendant in an exam for psychiatry by a psychiatrist before trial, I'd like to draw this Court's attention to the Young case where the Court said, quote, In the appeal at bar, there was easily accessible evidence of the defendant's prior hospitalizations for mental problems. Here, it is evident that even a cursory investigation would have discovered evidence relevant to the defense. Close quote. That's on page 27 of the brief where that quote is. And that's certainly the case where we have here. There's easily available evidence. You have the defendant taking psychotropic medication. You have the public record showing that he's already been found unfit. And a cursory investigation would have revealed that he had been repeatedly diagnosed with psychosis. So these cases apply directly here. Also, once the defendant did complain about his mental condition, there was no examination after that either. So there's no reason to believe that the attorney wasn't aware that he was taking psychotropic medication. If she wasn't aware of it, that's a serious problem in and of itself. She needed to know that her client was taking psychotropic medication. She should have followed up on that. And easily accessible evidence would have shown that he had the need for a psychiatric examination before trial. The statement here and in its brief states that the NCIC and Leafs records were turned over to the defense counsel. That is not established in this record. We draw this court's attention to page 1 of the reply brief where we ask this court to not consider that assertion. If you look in the records, in this case, there's no reference whatsoever to Leafs or NCIC. All it stated is the defense counsel states that the prosecution has turned over information concerning the witnesses prior to record. Nothing about Leafs, nothing about NCIC. But you're not contending that they had the actual Nevada records of her and didn't turn them over? Oh, I'm not contending that they had Leafs or NCIC or anything else. Anything. They're simply responsible under the law for knowing what the accurate, I mean, under the discovery process, they have to tell defense attorneys accurately what the prior records are. They have to be, they are responsible for disclosing the prior records of convictions. They are responsible for presenting the prior records of convictions. And they didn't do it. We know, or I'm sorry, I should not have said that. That's getting back into the Nevada material again. What they didn't do, they didn't correct the misstatement of the witness. When the witness said that his conviction was in 1994 and the prosecutor told the judge in 1996, he did not correct the witness. And the state was trying to get a bounce out of this by referring to the Leafs records and NCIC, and there's nothing in the records that shows that they turned that over to the defense counsel. What difference would the two years have made? Because he exaggerated his prior record of conviction, the time period, and he took the stand and exaggerated. And the jury, if he had been confronted with that, and the jury could have seen his reaction when confronted with that exaggeration, they could have concluded that he exaggerated his story about the .40 Gallagher pistol as well. He's the witness who gave testimony about the defendant supposedly having access to a .40 Gallagher pistol, and .40 Gallagher pistol shells were found outside. The jury needed to weigh the credibility of that witness concerning the prior statement that's attributed to the defendant, and they couldn't do that if they couldn't have the evidence necessary for impeachment. And they do have it. He was exaggerating. The prosecution admitted that he was exaggerating about it. He was making false statements about his prior history, and the jury could have concluded that he made false statements concerning what the defendant said as well, and he had exaggerated in the same way that he had exaggerated in his favor concerning the prior record of convictions. And that's why the jury needed to have all the evidence concerning this witness for impeachment so that they could carry on the constitutional function of determining the credibility of the witness. Let's go to some other questions. Thank you, Mr. Wells. Stacy. Mr. Norris. Excuse me? Yes. Can I announce something? You can announce something, yes. It's not an argument. It's part of the work, you know, that the state will be filing a petition for an impeachment exam. Mr. Wells. Okay. You're free to file it. I don't know that it needs to be announced, but thank you all for your briefs and arguments. Court stands on recess.